**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE A2P SMS ANTITRUST LITIGATION | ) MASTER FILE:  12 CV 2656 (AJN) <br> ) <br> ) ECF Case <br> ) |
| THIS DOCUMENT RELATES TO: <br> All Actions | ) **REPLY IN SUPPORT OF** <br> ) **DEFENDANTS' JOINT MOTION** <br> ) **TO DISMISS PLAINTIFFS' SECOND** <br> ) **CONSOLIDATED AMENDED** <br> ) **CLASS ACTION COMPLAINT** |

January 24, 2013

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

I. THE COMPLAINT FAILS TO ALLEGE AN AGREEMENT AMONG DEFENDANT CARRIERS TO REFUSE TRANSMISSION OF A2P MESSAGES ........................................................................................................... 1

II. THE COMPLAINT FAILS TO ALLEGE ANY CLAIM OF "PRICE-FIXING" .............. 4

III. PLAINTIFFS FAIL TO ALLEGE A CONSPIRACY TO MONOPOLIZE ...................... 7

IV. THE STATUTE OF LIMITATIONS BARS PLAINTIFFS' SUIT .................................. 8

CONCLUSION ............................................................................................................... 10

# TABLE OF AUTHORITIES

Page

**CASES**

*American Needle, Inc. v. NFL*, 130 S. Ct. 2201 (2010) ................................................................6

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..........................................................................................7

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ................................................................2, 3

*Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979) .......................................9

*Broadcast Music, Inc. v. CBS, Inc.*, 441 U.S. 1 (1979) ..................................................................5

*Eichman v. Fotomat Corp.*, 880 F.2d 149 (9th Cir. 1989) ..............................................................8

*Fashion Originators Guild of Am. v. FTC*, 312 U.S. 457 (1941) ...................................................4

*Kaw Valley Elec. Coop. Co. v. Kansas Elec. Power Coop., Inc.*, 872 F.2d 931
 (10th Cir. 1989) ..................................................................................................................8

*Klehr v. A.O. Smith Corp.* 521 U.S. 179 (1997) ..........................................................................8, 9

*Madison Square Garden, L.P. v. National Hockey League*, No. 07 CV 8455, 2008 WL
 4547518 (S.D.N.Y. Oct. 10, 2008) .................................................................................9, 10

*Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290 (2d Cir. 2008) ..................4

*Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.*, 364 U.S. 656 (1961) .............................4

*Rite Aid Corp. v. American Express Travel Related Servs. Co.*, 708 F. Supp. 2d 257
 (E.D.N.Y. 2010) ...............................................................................................................8, 9

*Sapienza v. Osleeb*, 550 F. Supp. 1304 (E.D.N.Y. 1982) ...............................................................8

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, CV F09-0560 LJO SMS, 2010 WL
 3521979 (E.D. Cal. Sept. 3, 2010) ......................................................................................8

*Texaco Inc. v. Dagher*, 547 U.S. 1 (2006) ..................................................................................4, 5

*Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321 (1971) ...........................................9

**OTHER MATERIALS**

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*:

    Vol. 2 (rev. ed.1995) .................................................................................................9

    Vol. 2 (3d ed. 2007) ..................................................................................................9

    Vol. 3B (3d ed. 2008) ...............................................................................................8

The Court should dismiss Plaintiffs' antitrust complaint because it fails to allege facts to support the claim that carriers reached a potentially unlawful agreement to boycott machine-generated ("A2P") text messages sent using ten-digit numbers. In the absence of such an alleged agreement, none of the other alleged conduct – including the creation of the Common Short Code ("CSC") system and the establishment of allegedly onerous terms of access to that system – violates either Section 1 or Section 2 the Sherman Act.

## I.  THE COMPLAINT FAILS TO ALLEGE AN AGREEMENT AMONG DEFENDANT CARRIERS TO REFUSE TRANSMISSION OF A2P MESSAGES

Count I of the complaint fails to state a claim because the SAC does not allege any agreement among the Carrier Defendants to "refuse to deal." Second Consolidated Amended Class Action Complaint ¶¶ 133, 134 ("SAC"). Though Plaintiffs insist that their complaint challenges "the CSC system itself," Pls.' Mem. in Opp. to Defs.' Mots. To Dismiss the SAC at 1 ("Opp."), the SAC and Plaintiffs' Opposition make clear that the basis for Plaintiffs' antitrust claim is not the creation of a system of short numeric codes that provide "access to the Carrier Defendants," SAC ¶ 8. Rather, Plaintiffs' claims hinge on an asserted "agree[ment] to refuse transmission" of machine-generated text messages from ten-digit numbers. *Id.*¶ 55; *see also* Opp. 9 (complaining about "preventing access to ten-digit numbers for transmission of A2P SMS"). The allegations of the complaint fail to support the bare assertion that Defendant Carriers reached any such agreement.

The creation of the CSC system required joint action if the system was to enable use of common numeric codes for delivery of messages to and from subscribers of each of the carriers, *see* Opp. 15 (asserting that "[t]he very nature of the CSC system . . . required agreements among the Carrier Defendants and the Aggregator Defendants to deliver a single service"), but the *offering* of CSCs is not a *refusal* to deal. By contrast, each carrier can make its own unilateral

decision whether and under what terms to accept (or not) machine-generated text messages sent from ordinary ten-digit numbers for delivery to its own subscribers. *See* SAC ¶ 154 ("[A]ny entity wishing to send or receive an A2P SMS to or from an individual must . . . connect[] to that individual through the carrier network to which that individual subscribes.").[1] While asserting that carriers' general refusal not to accept such messages reflects prior agreement, rather than independent action, Plaintiffs concede that they have not pleaded "any detail on when or where any agreement was made, which Defendants attended particular meetings, or any detail about what was agreed to." Opp. 10 ("That is not necessary.").[2] Instead, Plaintiffs argue that Defendants' "'parallel behavior'" supports an inference that Defendants acted pursuant to a conspiracy, rather than unilaterally. *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 n.4 (2007)). But that argument does not satisfy *Twombly* because the parallel conduct alleged in the complaint does not "bespeak unlawful agreement." 550 U.S. at 557. No individual wireless service provider has an incentive to allow marketers to use ordinary $20-per-month unlimited text messaging plans to send thousands or millions of machine-generated messages to its subscribers, irrespective of what other carriers may do. *See* Carrier Mem. 13-14.

---

[1] Plaintiffs themselves argue that creation of a CSC system is compatible with individual carriers striking separate deals with "high-volume transmitters" to connect directly to the carriers for transmission of A2P messages. Opp. 13-14; *see* SAC ¶ 73. The allegation that certain carriers accept A2P messages directly from high-volume transmitters ("who are favored for their volume and brand recognition," Opp. 3) further undermines the credibility of the conspiracy claims. The complaint alleges no facts to explain how Defendants somehow reached and implemented an agreement to permit exceptions to a supposed boycott. Moreover, the allegation suggests that carriers accept A2P messages from ten-digit numbers when it is in their unilateral interest to do so – and that they decline to accept such messages when *that* is in their unilateral interest.

[2] Plaintiffs refer to the alleged statement by an executive of one of the Aggregator Defendants that "long codes . . . are not authorized by U.S. carriers," SAC ¶ 67, but that statement, on its face, simply purports to describe the current state of the industry and does not imply that any agreement was reached. The statement is particularly unsurprising if it simply refers to the fact that Carrier Defendants have *not* agreed to expand the CSC system to include additional "long codes" with similar capabilities and controls.

2

Plaintiffs thus allege "merely parallel conduct that could just as well be independent action" and fail to state a claim under Section 1. *Twombly*, 550 U.S. at 557.

Plaintiffs argue that the creation of the CSC system supports the inference that carriers' alleged refusal to transmit A2P messages using ordinary ten-digit numbers was not the product of "unilateral business decisions," because, allegedly, the refusal to permit such transmission makes it possible to impose onerous terms for access to CSCs. Opp. 10. That argument has no force because Plaintiffs do not allege that Defendant Carriers initiated the alleged limitations on transmission of A2P messages using ten-digit numbers *as an element of* the CSC system. To the contrary, despite a direct challenge, Plaintiffs do not claim that any carrier offered to permit the use of ordinary ten-digit numbers to support transmission of machine-generated text messages to its subscribers prior to the establishment of the CSC system. *See* Carrier Mem. 14 n.14.[3] (The refusal to accept those messages is thus not a sudden change in the carriers' practices, Plaintiffs' suggestion to the contrary notwithstanding. *See* Opp. 14 n.20.) While the CSC system may be attractive in part because individual carriers do not generally make a comparable mechanism available using ten-digit numbers, the SAC contains no allegation that carriers eliminated an existing service. To the contrary, the allegations suggest that the CSC system made a service

---

[3] Moreover, as explained in Carrier Defendants' motion to dismiss, the original inter-carrier messaging guidelines, adopted in 2002 – a year prior to the alleged agreement to establish the CSC system, *see* SAC ¶ 60 – already reflected the fact that carriers agreement to exchange messages applied to text messages generated on wireless devices; carriers had not agreed to exchange machine-generated messages. *See* Carrier Mem. 6-7. Plaintiffs repeatedly rely on the guidelines, which are subject to judicial notice. *See* Opp. 9 n.12, 13 n.19; Carrier Mem. 6 n.8. Plaintiffs assert that that the 2002 inter-carrier guidelines established "standards for transmission of A2P SMS through CSCs," Opp. 13-14 n.19, but that is contrary to the allegations of the SAC, as well as to the content of the guidelines themselves. As alleged in the SAC, the CSC system was established in 2003, not 2002. *See* SAC ¶ 60. And the inter-carrier guidelines deal with exchange among carriers of "phone number addressed mobile-to-mobile text messages across wireless carrier networks," Connelly Decl. Exh. B at 18 – not machine-generated text messages addressed to five- or six-digit CSCs. *See also* Carrier Mem. 6-7.

available that individual carriers, acting unilaterally, had not offered because they were unwilling or unable to do so.

Plaintiffs cite no case where comparable allegations were held sufficient to support an inference of unlawful agreement.[4] While plaintiffs go out of their way to characterize binding Circuit precedent as "rejected," Opp. 8, *Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290 (2d Cir. 2008), is controlling and illustrates the distinction between a challenge to the creation of the CSC system – which Plaintiffs have not pleaded and which would be governed by the rule of reason – and a challenge to a distinct agreement to *refuse* accept certain types of messages. The essence of Plaintiffs' claim is that individual carriers have refused to permit use of ten-digit numbers for transmission of A2P messages to *their own* subscribers. Plaintiffs do not and cannot allege that the CSC system imposes or includes any such restriction.

## II. THE COMPLAINT FAILS TO ALLEGE ANY CLAIM OF "PRICE-FIXING"

Under the rubric of "price-fixing," Plaintiffs apparently seek to challenge both (1) terms of access to CSCs – that is, rates for leasing CSCs – and (2) additional charges that individual defendants (carriers and aggregators) allegedly impose for content review and transmission of messages. With respect to the first, establishment of a single price for what Plaintiffs themselves characterize as "a single service," Opp. 15, is not price-fixing and is not otherwise alleged to violate Section 1. With respect to the second, the SAC fails to allege any agreement.

**A.**   Plaintiffs' complaint that "uniform CSC license fees at $500 or $1,000 per month imposed in quarterly increments" are "at a monopoly level" (Opp. 14) does not constitute a price-fixing claim because, as the Supreme Court made clear in *Dagher*, "a joint venture, like

---

[4] *Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.*, 364 U.S. 656 (1961), and *Fashion Originators Guild of Am. v. FTC*, 312 U.S. 457 (1941), involved condemnation of actual group boycotts and did not address the question whether an agreement could be inferred from allegations like those in the SAC.

any other firm, must have the discretion to determine the prices of the products that it sells." *Texaco Inc. v. Dagher*, 547 U.S. 1, 7 (2006). Though Plaintiffs refer generically to "lease fees, per-message fees, connectivity fees, and program-review fees," the only prices that the SAC alleges are charged on a unitary basis are "lease rates" charged by Neustar, Inc. SAC ¶¶ 22, 75. Because some lease rate must be set "to market the [service] at all," these rates cannot form the basis of a price-fixing claim. *Broadcast Music, Inc. v. CBS, Inc.*, 441 U.S. 1, 23 (1979) ("*BMI*"); *see* Opp. 15 (noting that CSCs provide "a single service").[5] The remaining fees are charged by individual defendants – carriers or aggregators or others – and the SAC does not allege that they are set jointly. *See infra*, Part II.B.

Plaintiffs allege that rates for CSCs would be lower if defendants had "established a set of standards for the use of five- or six-digit . . . [CSCs] in connecting to their subscribers and allowed transmitters of [A2P] text messages . . . to connect directly to the Carrier Defendants either through CSCs or ten-digit numbers." Opp. 1; *see id.* 2 (referring to "[t]he difference between the competitive system that could have been established and the CSC system that was established"). But Plaintiffs do not explain how the wireless carriers could have established a CSC system that does not involve centralized assignment of CSCs – for which a single price logically must be set. And, as explained above, Plaintiffs have not alleged that the Carrier Defendants ever agreed *not* to permit direct transmission of A2P text messages to their own subscribers, *see supra* pp. 1-4 – to the contrary, Plaintiffs concede that individual carriers have agreed with certain "high-volume transmitters" to permit such transmissions. *See* Opp. 13-14.

---

[5] The SAC may suggest that, in some circumstances, content audits are also performed on a centralized basis. SAC ¶ 113; *but see* Opp. 15 n.23. To the extent such content audits are an element of the service, the charge for the performance of the function must likewise be set if that aspect of the service is to be made available "at all." *BMI*, 441 U.S. at 23.

5

In arguing that the fees associated with CSCs are too high, Plaintiffs do not propose any viable potential alternative. The CSC system offers the capability – as alleged in the complaint – to gain access to subscribers of *all* the Carrier Defendants using a single short code. No *individual* carrier can offer that capability, because no *other* carrier can be forced to accept and deliver to its subscribers machine-generated messages that are generated on a different carrier's network. To be sure, individual carriers can – and, as alleged in the complaint, do – make arrangements with individual customers ("high-volume transmitters") to "connect directly" for the delivery of A2P measures. Opp. 13-14. But the complaint alleges nothing about the costs of such direct connection, which are understandably high in light of the need to establish separate arrangements with multiple national carriers and additional regional carriers. Nor does the complaint explain why any carrier would agree to dispense with the controls associated with the CSC system – or other equivalent measures to guarantee protection of subscribers – in making arrangements for such direct connection. Plaintiffs argue that challenged fees are too high compared to a hypothetical "but-for" world in which carriers allow marketers to bombard customers with an unlimited number of computer-generated text messages from an unlimited-usage account for a single $20-per-month payment. *See* Opp. 5. The SAC alleges no support for the claim that any carrier would have an interest in permitting such an arrangement.

Plaintiffs likewise do not allege a rule-of-reason challenge to the CSC system – *i.e.*, that the agreement to offer CSCs unreasonably restrains competition among the defendants. *See* Opp. 9; *cf. American Needle, Inc. v. NFL*, 130 S. Ct. 2201, 2216-17 (2010). Plaintiffs nowhere allege or argue that the CSC system unreasonably restrains trade on the assumption that carriers did *not* agree to boycott A2P messages from ten-digit numbers: to the contrary, Plaintiffs argue that "[i]n the absence of an agreement to prevent the use of competing ten-digit numbers . . . no monopoly rents . . . would have been available." Opp. 10. Plaintiffs' legal challenge to the CSC

6

system is expressly premised on the claimed existence of a concomitant agreement "to prevent the use of competing ten-digit numbers," *id.* – which the complaint fails to allege.

      **B.**      With respect to program-review fees, per-message fees, connection fees, and certain content-audit fees that individual carriers and aggregators may charge or require, the SAC does not allege uniform pricing or any other facts that would provide a basis for inferring that Defendants reached any agreement with respect to these fees. *See* Carrier Mem. 15-17. Plaintiffs fail to contest this in their Opposition, merely insisting that they have "alleged sufficient [unspecified] facts to give rise to a far-more-than-plausible inference of an agreement." Opp. 16.[6] Such unsupported assertions cannot satisfy the requirement that a complaint "plead[] factual content that allows the court to draw the reasonable inference that the defendant[s] [are] liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

**III.**    **PLAINTIFFS FAIL TO ALLEGE A CONSPIRACY TO MONOPOLIZE**

      Plaintiffs do not contest that, in the absence of a proper allegation of an agreement among the Defendants to refuse to permit transmission of machine-generated text messages from ten-digit numbers, their claim for conspiracy to monopolize likewise fails because there is no other allegation of exclusionary conduct. *See* Carrier Mem. 18; *cf.* Opp. 17 (relying on prior arguments for assertion that the SAC adequately supports "the inference of an agreement").

      Plaintiffs' claim under Section 2 should also be dismissed because the SAC fails to plead that any defendant intended to confer a monopoly in the market for "A2P SMS transmission . . . in the United States." SAC ¶ 151; *see* Carrier Mem. 17-18. According to the complaint, the Carrier Defendants, *collectively*, "control[] more than 70%" of the purported market, but no

---

[6] Plaintiffs' argument that "any program-review fees, even if within a range . . . represent anti-competitive profits," Opp. 15, misses the point: the SAC fails to allege any agreement on price. And no individual carrier would have a unilateral interest in dispensing with program reviews designed to protect its subscribers from potentially abusive text messages.

defendant has or approaches anything like a monopoly share.  SAC ¶ 153.  Plaintiffs cite no authority for the proposition that Section 2 can be stretched to encompass this type of allegation of shared market power.  *See* 3B Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 810g, at 480 (3d ed. 2008) ("[C]ourts . . . have universally rejected claims that § 2 condemns 'shared' monopoly.").  If any allegation of agreement to reduce competition among competitors were sufficient to establish an intent to monopolize, then a typical § 1 claim could be alternatively pleaded as a conspiracy-to-monopolize claim; that is not the law.

## IV. THE STATUTE OF LIMITATIONS BARS PLAINTIFFS' SUIT

Plaintiffs' action is untimely because they failed to file it within four years of the "creat[ion]" of "the CSC system" in 2003 (Opp. 11).  *See* Carrier Mem. 19-24; *Sapienza v. Osleeb*, 550 F. Supp. 1304, 1308 (E.D.N.Y. 1982) ("[T]he controlling event for purposes of determining when an antitrust cause of action accrues is not . . . when injury is suffered, but rather when an injurious act is performed.").  Plaintiffs argue (at 19-20) that their suit is timely because they have paid CSC fees during the limitations period.  But such payments do not revive stale claims challenging arrangements entered into outside of the limitations period.[7]

None of the cases Plaintiffs cite (at 19-20) is to the contrary.  *Klehr v. A.O. Smith Corp.* 521 U.S. 179 (1997), was a civil RICO case; it held that the defendants' commission of a

---

[7] *See* Carrier Mem. 23; *Eichman v. Fotomat Corp.*, 880 F.2d 149, 160 (9th Cir. 1989) ("[T]he passive receipt of profits from an illegal contract by an antitrust defendant is not an overt act of enforcement which will restart the statute of limitations."); *Kaw Valley Elec. Coop. Co. v. Kansas Elec. Power Coop., Inc.*, 872 F.2d 931, 933 n.5 (10th Cir. 1989) ("[T]he mere receipt of benefits within the limitations period from antitrust violations that occurred outside the limitations period does not give rise to a new cause of action."); *Rite Aid Corp. v. American Express Travel Related Servs. Co.*, 708 F. Supp. 2d 257, 270 (E.D.N.Y. 2010) ("Collecting a contract fee is not a new and independent act."); *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, CV F09-0560 LJO SMS, 2010 WL 3521979, at *16 (E.D. Cal. Sept. 3, 2010) ("Continual purchasing of the products is merely an affirmation of defendants' prior conduct and does not inflict a 'new and accumulating' injury on plaintiff.").

8

predicate act within the limitations period that resulted in no additional harm to the plaintiffs did not make the suit timely. *See id.* at 186-91. Plaintiffs mischaracterize the Court's statement that, "in the case of a 'continuing violation,' say, a price–fixing conspiracy *that brings about a series of unlawfully high priced sales over a period of years*, 'each overt act that is part of the violation and that injures the plaintiff,' *e.g.*, each sale to the plaintiff, 'starts the statutory period running again.'" *Id.* at 189 (quoting 2 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 338b, at 145 (rev. ed.1995)) (emphasis added). That dictum suggests only that, in the case of "price-fixing conspirators who meet once a year to adjust the cartel price," each change in price "is independently unlawful." 2 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 320c2, at 289 (3d ed. 2007). It provides no guidance here, where the complaint affirmatively alleges that the rates for leasing CSCs "have not changed since 2003." SAC ¶ 77; *see* Carrier Mem. 22 n.20 (addressing *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979)).[8]

Plaintiffs also claim (at 20) to "have alleged overt acts in the limitations period beyond any pre-existing agreement." But the two asserted "acts" are merely "reaffirmation[s]" of the supposed 2003 agreement. *Madison Square Garden, L.P. v. National Hockey League*, No. 07 CV 8455, 2008 WL 4547518, at *10 (S.D.N.Y. Oct. 10, 2008). Plaintiffs claim (at 20) that

---

[8] *Rite Aid* supports Defendants, not Plaintiffs, because it rejects the proposition that the payment of allegedly supracompetitive fees suffices to restart the limitations period for a § 1 claim. *See* 708 F. Supp. 2d at 270-71. (The court also concluded that the plaintiffs had pleaded a continuing violation by alleging that the defendant had "unilateral[ly] increase[d]" the fee in question during the limitations period – conduct not alleged here. *Id.* at 271-72.) With respect to the § 2 claim, *Rite Aid* erroneously read *Berkey Photo* as holding that "[a] purchaser plaintiff's cause of action accrues when he or she actually pays an overcharge" not "at the time of the defendant's anticompetitive conduct." *Id.* at 264. *Berkey Photo* indicated only that the statute of limitations would not begin to run when a purchaser's damages were "speculative." *See* Carrier Mem. 22 n.20. Reading *Berkey Photo* to say that any purchase by a plaintiff restarts the limitations period would not only conflict with the Supreme Court's holding that accrual turns on the defendant's conduct, *see Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971), but also "indefinitely lengthen[] the statute of limitation," 2 Areeda, *Antitrust Law* ¶ 320c, at 286.

9

Defendants continued their refusal to deal by "exchanging the names of CSC Lessees who attempted ten-digit transmission of text messages to terminate those 'cheaters.'" Continued refusals to deal, however, do not constitute overt acts restarting the limitations period. *See* Carrier Mem. 21; Aggregator Mem. 17-18. Plaintiffs also assert that the most recent versions of the Intercarrier Messaging Guidelines were "unlike the[ir] predecessors" in "recommend[ing] using only CSCs, not ten-digit numbers, for A2P SMS." Opp. 20. At the outset, as Plaintiffs concede, this is just a recommendation, and not a new agreement. Moreover, the complaint asserts that CTIA members agreed in 2003 that only CSCs, not ten-digit numbers, would be used for A2P SMS. *See* SAC ¶¶ 60, 63; *see also* Opp. 4 ("A key element of the CSC system was the agreement that the Carrier Defendants . . . would refuse to transmit A2P SMS through ten-digit numbers."). As discussed above, the SAC fails to allege facts to support the claim that any such agreement occurred. But, accepting the SAC's bare assertions at face value, the recent version of the Guidelines reaffirm but do not alter the original asserted 2003 agreement.[9]

Plaintiffs' claims are thus time-barred.

## CONCLUSION

The Court should grant the motion.

---

[9] It makes no difference that one of the named Plaintiffs entered into a contract with one of the Aggregator Defendants in 2010, *see* Opp. 19, because the complaint does not allege that the terms of the challenged arrangement changed in any meaningful respect. *See Madison Square Garden*, 2008 WL 4547518, at *10 ("renewal of the [challenged] licensing agreements and the [defendant]'s enforcement of [the challenged] policies" did not constitute overt acts). Moreover, the complaint does *not* allege that any named Plaintiff first suffered injury from the challenged arrangement only after the start of the limitations period.

It is likewise irrelevant that Defendant WMC allegedly began performing audits only in 2009, *see* Opp. 19-20, because the complaint asserts that those audits occurred before WMC began performing them and does not allege that the audits changed in any material respect after WMC began, *see* SAC ¶¶ 113-119.

Respectfully submitted,

| | |
|---|---|
| CELLCO PARTNERSHIP D/B/A VERIZON WIRELESS | CTIA—THE WIRELESS ASSOCIATION |

CELLCO PARTNERSHIP D/B/A VERIZON WIRELESS

By: /s/ Luke A. Connelly
Luke A. Connelly
WINSTON & STRAWN LLP
MetLife Building
200 Park Avenue
New York, New York 10166
Telephone: (212) 294-6882
Email: lconnelly@winston.com

Thomas J. Frederick
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
Telephone: (312) 558-5983
Email: tfrederick@winston.com

Andrew G. McBride (AM1966)
WILEY REIN LLP
1776 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 719-7000
Email: amcbride@wileyrein.com

Of Counsel:
Aaron M. Panner
Brendan J. Crimmins
KELLOGG, HUBER, HANSEN, TODD,
   EVANS & FIGEL, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Telephone: (202) 326-7900
Email: apanner@khhte.com
           bcrimmins@khhte.com

Thomas R. McCarthy
Christiane M. McKnight
WILEY REIN LLP
1776 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 719-7000
Email: tmccarthy@wileyrein.com
           cmcknight@wileyrein.com

CTIA—THE WIRELESS ASSOCIATION

Scott Martin
GREENBERG TRAURIG, LLP
MetLife Building
200 Park Avenue
New York, New York 10166
Telephone: (212) 801-2231
Facsimile: (212) 801-6400
Email: martinsc@gtlaw.com

Of Counsel:
Ruth A. Bahe-Jachna
GREENBERG TRAURIG, LLP
77 West Wacker Drive, Suite 3100
Chicago, Illinois 60601
Telephone: (312) 456-8421
Facsimile: (312) 899-0312
Email: baher@gtlaw.com

Michael D. McNeely (admitted *pro hac vice*)
3706 Huntington Place, N.W.
Washington, D.C. 20015
Telephone: (202) 966-1679
Facsimile: (202) 747-5898
Email: mcneelylaw@mac.com

SPRINT NEXTEL CORPORATION

John E. Schmidtlein (admitted *pro hac vice*)
Michael V. Pinkel (admitted *pro hac vice*)
Megan A. Hughes
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 434-5000
 Email: jschmidtlein@wc.com
           mpinkel@wc.com
           mhughes@wc.com

| AT&T MOBILITY LLC | T-MOBILE USA, INC. |
|---|---|
| Steven M. Bierman<br>787 Seventh Avenue<br>New York, New York 10019<br>Telephone:  (212) 839-5300<br>Facsimile:  (212) 839-5599<br>E-mail:  sbierman@sidley.com | Christopher B. Hockett (admitted *pro hac vice*)<br>Micah G. Block (admitted *pro hac vice*)<br>DAVIS POLK & WARDWELL<br>1600 El Camino Real<br>Menlo Park, California 94025<br>Telephone:  (650) 752-2009<br>Email:  chris.hockett@davispolk.com<br>            micah.block@davispolk.com |
| John W. Treece<br>Linton J. Childs<br>SIDLEY AUSTIN LLP<br>One South Dearborn<br>Chicago, Illinois 60603<br>Telephone:  (312) 853-7000<br>Facsimile:  (312) 853-7036<br>E-mail:  jtreece@sidley.com<br>            lchilds@sidley.com | Joel M. Cohen<br>DAVIS POLK & WARDWELL<br>450 Lexington Avenue<br>New York, New York 10017<br>Telephone:  (212) 450-4592<br>Email:  joel.cohen@davispolk.com |

U.S. CELLULAR CORPORATION

Lawrence Kill
Carrie Maylor DiCanio
ANDERSON KILL & OLICK P.C.
1251 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 278-1000
Email:  lkill@andersonkill.com
            cdicanio@andersonkill.com