UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE A2P SMS ANTITRUST LITIGATION | MASTER FILE:  12 CV 2656 (AJN) |
| | **ECF Case** |
| THIS DOCUMENT RELATES TO: All Actions | |

# REPLY IN SUPPORT OF CARRIER DEFENDANTS' MOTION TO COMPEL ARBITRATION

Winston & Strawn LLP
200 Park Avenue
New York, New York 10166

January 24, 2013

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ...............................................................................................................1

I.     ARGUMENT................................................................................................................2

    A.     The CSC Agreement's Choice-Of-Law Clause Does Not Restrict The Scope Of Matters Subject To Arbitration Under That Agreement. .........................2

    B.     Plaintiffs' Arguments Against Third-Party Enforcement Of The CSC Arbitration Agreement Are Without Merit. ............................................................3

        1.     Plaintiffs' Unclean Hands Argument Is Meritless. ....................................3

        2.     Plaintiffs Cannot Evade Arbitration With Third-Party Beneficiaries By Running Away From The CSC Agreement Or Their Allegations. ........4

    C.     Carrier Defendants Are Entitled To Enforce The Aggregators' Agreements..........5

    D.     Plaintiffs TextPower And iSpeedbuy Cannot Avoid Arbitration By Contending That They Need A Class Action To Vindicate Their Claims. .............6

II.     CONCLUSION...........................................................................................................10

# **TABLE OF AUTHORITIES**

**Page(s)**

**FEDERAL CASES**

*In re American Express Merchants Litigation*,
    667 F.3d 204 (2d Cir. 2012) ................................................................................................... 2

*Buckeye Check Cashing, Inc. v. Cardegna*,
    546 U.S. 440 (2006) ............................................................................................................... 4

*Green Tree Financial Corp.–Alabama v. Randolph*,
    531 U.S. 79 (2000) ................................................................................................................. 6

*LaVoice v. UBS Financial Services, Inc.*,
    2012 WL 124590 (S.D.N.Y. Jan. 13, 2012) .......................................................................... 9

*Lismore v. Société Générale Energy Corp.*,
    2012 WL 3577833 (S.D.N.Y. Aug. 17, 2012) ................................................................. 2, 3

*Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*,
    460 U.S. 1 (1983) ................................................................................................................... 3

*Nitro-Lift Technologies, L.L.C. v. Howard*,
    133 S. Ct. 500 (2012) ............................................................................................................ 4

*PenneCom B.V. v. Merrill Lynch & Co.*,
    372 F.3d 488 (2d Cir. 2004) ................................................................................................. 5

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*,
    388 U.S. 395 (1967) ............................................................................................................... 4

*Ragone v. ESPN*,
    595 F.3d 115 (2d Cir. 2010) .......................................................................................... 2, 3, 7

*Republic of Iraq v. ABB AG*,
    769 F. Supp. 2d 605 (S.D.N.Y. 2011) .................................................................................. 6

*Signature Flight Support Corp. v. Landow Aviation Ltd. Partnership*,
    698 F. Supp. 2d 602 (E.D. Va. 2010) .................................................................................. 4

*Sokol Holdings, Inc. v. BMB Munai, Inc.*,
    542 F.3d 354 (2d Cir. 2008) ................................................................................................. 4

*Stolt-Nielsen S.A. v. AnimalFeeds International Corp.*,
    130 S. Ct. 1758 (2010) ......................................................................................................... 10

**STATE CASES**

*Cline v. Berg*,
 639 S.E.2d 231 (Va. 2007)......................................................................................................4

*Sardanis v. Sumitomo Corp.*,
 282 A.D.2d 322 (N.Y. App. Div. 2001) .................................................................................5

Carrier Defendants[1] respectfully submit this reply brief in further support of their Motion to Compel Arbitration pursuant to Section 3 of the Federal Arbitration Act ("FAA").

Plaintiffs attempt four stratagems to avoid arbitration. None persuades. *First*, Plaintiffs suggest a bizarre reading of the arbitration clause under which a prescription that "[t]he arbitrators shall determine the matters in dispute in accordance with the internal law of the Commonwealth of Virginia" would become a requirement that all "matters in dispute" *must arise* under Virginia law. This "Virginia claim only" approach has no support in the text of the CSC Agreement and would render the arbitration clause a practical nullity.

*Second*, while implicitly conceding that equitable estoppel otherwise applies, Plaintiffs argue that Defendants have "unclean hands" based only on the allegations in the SAC. But they rely on cases showing that *actual proof*—not mere allegations—of misconduct is required.

*Third*, Plaintiffs run away from the structure of the CSC system as described in the SAC, the CSC Agreement, and the Aggregator Agreements. The SAC alleges that "the Carrier Defendants dominated and controlled CTIA's activities," SAC ¶ 32, and, "[t]hrough the CTIA, ... established co-conspirator [Neustar] as the ... only entity that could issue CSCs with access to the Carrier Defendants," *id.* ¶ 8. Yet here, Plaintiffs attempt to portray Carrier Defendants and CTIA as strangers to the CSC Agreement who should not be allowed to invoke its dispute resolution provisions when sued for conduct clearly sanctioned under that agreement. Plaintiffs' position reduces to an argument that only Neustar can enforce the arbitration clause in the CSC Agreement and that, by the artifice of naming Neustar as a "co-conspirator" rather than a defendant, Plaintiffs have avoided their obligation to arbitrate. But this is contrary to both

---

[1] Carrier Defendants refers to AT&T Mobility LLC, Cellco Partnership d/b/a Verizon Wireless, Sprint Nextel Corporation, T-Mobile USA, Inc. and U.S. Cellular Corporation, collectively.

1

Circuit precedent, *Ragone v. ESPN*, 595 F.3d 115 (2d Cir. 2010), and this Court's decision in *Lismore v. Société Générale Energy Corp.*, 2012 WL 3577833 (S.D.N.Y. Aug. 17, 2012).

*Fourth*, TextPower and iSpeedBuy offer rather weak evidence that individual arbitration would be cost-prohibitive (and Club Texting concedes the opposite). Plaintiffs bear a very substantial burden in this regard, and their evidentiary submissions fall far short. Plaintiffs' cost predictions are wildly exaggerated and wholly speculative; they rest on a series of unsupported "worst case scenario" assumptions that are contrary to AAA rules and to the way that arbitrations are actually conducted. In any event, the Court should not attempt any evaluation of Plaintiffs' evidentiary submissions until it receives guidance from the Supreme Court in *In re American Express Merchants Litig.*, 667 F.3d 204 (2d Cir. 2012) ("*Amex III*").

I. **ARGUMENT**

   A. **The CSC Agreement's Choice-Of-Law Clause Does Not Restrict The Scope Of Matters Subject To Arbitration Under That Agreement.**

The CSC Agreement requires arbitration of "[a]ny dispute, controversy, or claim arising out of or relating to this Agreement[.]" Mot., Connelly Decl. Ex. A ¶ 19. Plaintiffs do not dispute that their claims fall within this language. Instead they argue that the requirement that "arbitrators shall determine the matters in dispute in accordance with the internal law of … Virginia," *id.*, means that the arbitration clause *applies only* to claims made under Virginia law. But this provision says nothing about what law the "matters in dispute" must arise under; rather, it goes to the procedures the arbitrators must employ in resolving arbitrable disputes. Any other reading eviscerates the text and leads to the untenable result that pleading around the CSC Arbitration Agreement would be a simple matter of avoiding claims under Virginia law.

Plaintiffs argue that because the CSC Agreement contains a separate choice-of-law clause, *id.* ¶ 21, the statement in paragraph 19 that Virginia law governs the proceedings in

2

arbitration must do something more than fix the applicable procedural law. But the "Governing Law" or choice-of-law clause in paragraph 21 is a rule of construction for interpreting the entire contract that ousts ordinary conflict-of-laws analysis. By contrast, the reference to Virginia law in the arbitration clause applies only to the conduct of the arbitrators in resolving arbitrable disputes. Each provision has a distinct function and the rule of construction that contracts should be construed to avoid surplusage cannot support distorting the language of either clause to place unsupported limitations on the scope of arbitrable matters.

Finally, even if the arbitration clause and the choice-of-law clause, taken together, were ambiguous, that would not support Plaintiffs' position. The FAA requires that any ambiguity be resolved, not against the drafter, but "*in favor of arbitration*, [even where] the problem at hand is construction of the contract language itself." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983) (emphasis added).

### B. Plaintiffs' Arguments Against Third-Party Enforcement Of The CSC Arbitration Agreement Are Without Merit.

#### 1. Plaintiffs' Unclean Hands Argument Is Meritless.

*Ragone* and *Lismore* compel the conclusion that Plaintiffs should be equitably estopped from refusing to arbitrate their claims against Carrier Defendants. As in those cases, Plaintiffs' claims "arise under the 'subject matter' of the" CSC Agreement and there "exists a sufficiently 'close relationship' between" Carrier Defendants, CTIA, and Neustar. *Ragone*, 595 F.3d at 127-28; *Lismore*, 2012 WL 3577833, at *8. Indeed, Plaintiffs were well aware that they would be dealing extensively with the Carrier Defendants to effectuate the CSC Agreement at the time they accepted that agreement.

Plaintiffs make no attempt to distinguish *Ragone* or *Lismore*. Instead, Plaintiffs argue that the Carrier Defendants are barred from invoking equitable estoppel under the doctrine of

unclean hands.  Opp. 6-7; 21-25.  But, under Virginia law, the doctrine of unclean hands applies to defeat equitable relief only when the *evidence* demonstrates inequitable conduct.  *Cline v. Berg*, 639 S.E.2d 231, 234 (Va. 2007) (unchallenged factual findings of inequitable conduct); *Signature Flight Support Corp. v. Landow Aviation Ltd. P'ship*, 698 F. Supp. 2d 602, 625 (E.D. Va. 2010) ("substantial evidence" of unclean hands).  Mere *allegations* of inequitable conduct do not suffice.

Moreover, the FAA requires that any showing of "unclean hands" relate to the arbitration agreement itself, not the merits of the underlying claims or the contract as a whole.  *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 (1967).  Were it otherwise, it would be a simple matter to plead around any arbitration clause by alleging the illegality of the agreement that contained it.  Not surprisingly, the Supreme Court has repeatedly rejected this tactic.  *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445-46 (2006); *Nitro-Lift Techs., L.L.C. v. Howard*, 133 S. Ct. 500, 502-04 (2012).[2]

        2.        **Plaintiffs Cannot Evade Arbitration With Third-Party Beneficiaries By Running Away From The CSC Agreement Or Their Allegations.**

Plaintiffs misstate the law in an effort to avoid a routine application of third-party beneficiary doctrine to Carrier Defendants.  Plaintiffs suggest that the test is whether "these Defendants were intended by the CSC lessees to be entitled to invoke the arbitration clause as direct beneficiaries."  Opp. 8.  But as Plaintiffs themselves later acknowledge, the test is not clause specific.  The question is whether the parties to the contract intended to confer *any* benefits upon the third party.  Br. 11.

---

[2] Plaintiffs' reliance on *Sokol Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d 354 (2d Cir. 2008), is also misplaced.  There, the court found that it would be unfair to permit a non-signatory to invoke an arbitration clause on the basis of a relationship with the signatory that arose *after* the agreement was formed as a result of the non-signatory's alleged tortious interference.  *Id*. at 362.

The CSC Agreement confers numerous benefits upon the Carrier Defendants, including the right to conduct content audits and to collect fees to cover the costs of those audits, and the right to receive per message fees and payments for goods and services that are purchased through the CSC system. The intent to benefit these "Participating Carriers" inheres in the very raison d'être of the CSC system—to allow mass, two-way communication and commerce across all the major carriers' networks. Plaintiffs challenge that system, alleging that the benefits the Carriers receive from the CSC Agreement are unlawful. Such a claim must be arbitrated.[3]

### C. Carrier Defendants Are Entitled To Enforce The Aggregators' Agreements.

Carrier Defendants are entitled to enforce the OpenMarket and mBlox arbitration clauses under principles of equitable estoppel. Plaintiffs oppose the application of estoppel only as to the OpenMarket clause. Plaintiffs' argument that Defendants have unclean hands and thus cannot enforce the OpenMarket arbitration clause, Opp. 23, fails for the reasons set forth above, namely that mere allegations of inequitable conduct do not suffice, *PenneCom B.V. v. Merrill Lynch & Co.*, 372 F.3d 488, 493 (2d Cir. 2004); *Sardanis v. Sumitomo Corp.*, 282 A.D.2d 322, 324 (N.Y. App. Div. 2001), and that the FAA requires that the evidence of "unclean hands" relate to the arbitration agreement itself, not the merits of the underlying claims, *supra* at 4. Their alternate argument, that Carrier Defendants "do not have a close enough relationship with TextPower" to support an inference that TextPower consented to arbitrate with them, Opp. 23-24, likewise fails for reasons set out above, *supra* at 3. TextPower must have known when it entered the OpenMarket Agreement, which enabled its connection to Carrier Defendants' networks, that the agreement would entail significant dealings with Carrier Defendants. *Id.*; Br. 19-21.

---

[3] Plaintiffs assert that Neustar and the CSC Lessees are the only "parties" entitled to invoke the arbitration clause. Opp. 11. But the CSC Agreement (unlike many business-to-business contracts) does not define the term "party," and the arbitration clause is not party-specific. The arbitration clause refers to a "party to arbitration[,]" Mot., Connelly Decl. Ex. A ¶ 19, in specifying a deadline for submission of claims *after arbitration has commenced*, not to limit the parties entitled to invoke the clause in the first place.

Nor can Plaintiffs avoid the fact that the OpenMarket Agreement confers benefits on the Carrier Defendants. *Id*. 21-23. The claim that the Carriers cannot invoke the arbitration clause as third-parties because they are not expressly mentioned in that clause, Opp. 21, misstates the law. Were it otherwise, third-party enforcement would be impossible. A beneficiary need not be identified *at all* to enforce rights as a third-party. Br. 22.

Plaintiffs contend that *Republic of Iraq v. ABB AG*, 769 F. Supp. 2d 605 (S.D.N.Y. 2011), is "highly instructive," Opp. 22, but it is inapposite. There, the term "Party" was expressly defined to include only the contractual parties, and the court's decision turned on that fact. 769 F. Supp. 2d. at 609, 614. By contrast, the OpenMarket arbitration clause does not limit the right to arbitrate to "parties" or "signatories." Br. 23. The term "parties" is not defined and, as used in the arbitration clause, it refers to parties to the arbitration—not to the entire contract. Joint Aggregators' Br., Emmet Decl. Ex. A § 14.5.

### D. Plaintiffs TextPower And iSpeedbuy Cannot Avoid Arbitration By Contending That They Need A Class Action To Vindicate Their Claims.

Plaintiffs TextPower and iSpeedbuy contend that their arbitration agreements should not be enforced because (they say) the cost of arbitrating their federal antitrust claims on an individual basis would be prohibitive. Opp. 25-29. But Plaintiffs cannot show that the costs specific to individual arbitration (as opposed to court litigation) would preclude any plaintiff "from effectively vindicating [its] federal statutory rights in the arbitral forum." *Green Tree Fin. Corp.–Ala. v. Randolph*, 531 U.S. 79, 90 (2000); *id.* at 91 (mere "'risk' that [a plaintiff] will be saddled with prohibitive costs is too speculative to justify the invalidation of an arbitration agreement"). Even under *Amex III*—which permits a plaintiff to rely on the cost of litigation (arbitration-specific or not) to avoid an arbitration clause—Plaintiffs cannot make the required

6

showing. In any event, the Court should not decide these issues until the Supreme Court has clarified the governing law.

**1.** Plaintiffs cannot show that arbitration-specific costs of litigation preclude them from effectively vindicating their federal rights. Although they assert that arbitrator fees would be between $60,000 and $163,000 for a single arbitrator, Opp. 28, Plaintiffs have wildly inflated these figures.[4] *First*, Professor Bermann's assumption that it would be necessary to pay the arbitrator fees that exceed the amount in controversy in iSpeedbuy's arbitration ignores the arbitrator's ability to tailor procedures to the amount at stake. Connelly Decl. Ex. 1, Decl. of Edna Sussman ("Sussman Decl.") ¶¶ 17-21, 40-41, 47-52, 54-59, 74-77. An arbitrator can work with the parties to ensure that the cost of arbitration is not disproportionate to the amount in dispute by, for example, streamlining presentations, focusing discovery, and using the AAA's Expedited Procedures to achieve the cost-effective resolution of claims for up to $75,000. *Id.*

*Second*, Professor Bermann's assumptions that an arbitrator would charge between $500 and $800 per hour and spend between 120 to 204 hours on the case appear to be drawn from his experience with complex international arbitrations. Bermann Decl. ¶¶ 4-12. The prevailing rates for domestic arbitrators who hear complex commercial and antitrust claims are lower; many charge $325 per hour or less. Sussman Decl. ¶¶ 25-31. Indeed, Sussman's own rate and those of many other highly qualified arbitrators in New York (where billing rates generally are higher) are below the low end of Bermann's range. *Id.* ¶ 27. Moreover, domestic arbitrators likely would be able to resolve individual arbitrations of claims akin to TextPower's and iSpeedbuy's

---

[4] Plaintiffs assert that the costs of a three-arbitrator panel would be as much as $512,000. While that figure itself is wildly inflated for the reasons that follow in text, Defendants are willing to waive their right under the CSC Agreement to a three-arbitrator panel, thus mooting this issue. Defendants will also waive their rights to have arbitrations take place in any particular geographical location so that arbitrations may be conducted near the Plaintiffs' principal places of business. The Second Circuit has held that waivers such as these properly moot those aspects of challenges to an arbitration clause. *Ragone*, 595 F.3d at 124.

7

in between 28 and 105 hours, which would mean that the arbitrator's compensation would be between $9,100 and $34,125 (*id.* ¶¶ 36-77, 94)—far lower than Professor Bermann's estimates.[5]

*Third*, Plaintiffs ignore that the arbitration costs would be allocated or shared among the parties by the arbitrator. Arbitrators typically require the claimant to pay the full costs only as a sanction for vexatious litigation. Sussman Decl. ¶ 83. Even when a good-faith claimant loses, arbitrators generally require the parties to split the arbitration costs. *Id.* Defendants agree to a pro rata split of those costs here.

Allocating costs among the parties would greatly affect TextPower's and iSpeedbuy's share of the total arbitration costs—not least because eight defendants have moved to compel iSpeedbuy to arbitrate and nine defendants have moved as to TextPower. Even assuming *arguendo* the accuracy of Bermann's excessive estimates, if the arbitrator requires the parties to split the costs pro rata, Plaintiffs would have to pay a ninth or tenth of those amounts—*i.e.*, from $6,955.56 to $18,422.22 for iSpeedbuy and from $6,870 to $17,190 for TextPower. *See id.* ¶¶ 80-81. Using more realistic numbers, iSpeedbuy would have to pay only between $1,152.78 and $3,933.33 and TextPower only between $1,315 and $3,817.50. *See id.* ¶ 94. The lower ends of those ranges are more likely (*id.* ¶¶ 72, 97), but regardless of where in the range the costs fall, those amounts clearly would not be prohibitively excessive for claims for over $94,500 and $692,550, respectively. Opp. 27.

**2.** Relying on *Amex III*, Plaintiffs also contend that the costs of securing attorneys and expert witnesses render it infeasible to pursue their antitrust cases on an individual basis in arbitration. Opp. 25-26. Even under the *Amex III* rubric, Plaintiffs cannot meet the high burden of showing that they cannot vindicate their statutory rights in individual arbitrations. To begin

---

[5] Professor Bermann also overestimated the filing and hearing fees—which likely would be only $1,275 for iSpeedbuy and $4,050 for TextPower—by half. Sussman Decl. ¶¶ 22-24.

with, they ignore the fact that Plaintiff Club Texting effectively concedes that it *can* feasibly arbitrate its claims on an individual basis; only TextPower and iSpeedbuy object that individual arbitration would be too costly.  Club Texting is represented by the same counsel and would be using the same expert witnesses to present the same claims as TextPower and iSpeedbuy, who need not reinvent the wheel.  Only a modicum of attorney and expert time would be needed to adapt the case for TextPower's and iSpeedbuy's follow-on arbitrations.

Moreover, Plaintiffs' estimates of their attorneys' and expert fees and costs are based on a series of assumptions that individual arbitrations will unfold in the same way as class-action litigation does in court.  For example, Plaintiffs rely on the testimony of their own attorney in this case—Joseph Kohn—for the notion that they will incur millions in attorneys' fees to arbitrate their claims, as well as their own self-serving declarations that they would not pursue their claims in arbitration.  Opp. 27.  But Kohn's declaration assumes that each arbitration must probe every aspect of every allegation concerning the class as a whole across the entire 10-year class period, Kohn Decl. ¶¶ 7-12, even though an individual arbitration would focus only on allegations relating to the particular plaintiff.  Additionally, he bases his calculation on the fees incurred in past antitrust *class actions in court—not arbitrations*, notwithstanding the significant differences between litigation and arbitration, including that discovery is far more limited in arbitration, and that there is little in the way of motion practice.  *Id.* ¶ 13.  Mr. Kohn's and Plaintiffs' declarations should be accorded no weight.  *LaVoice v. UBS Fin. Svs., Inc.*, 2012 WL 124590, at *8 (S.D.N.Y. Jan. 13, 2012) (giving no "consideration to [plaintiff's] and counsel's unwillingness to pursue [] claims in the absence of a class" because their "statements [were] self-serving and irrelevant").

Similarly, Dr. Michael Williams—the source of Plaintiffs' estimate of expert costs, Opp. 27—assumes that the expert must "[a]nalyze on economic grounds the appropriateness of *class certification*" and construct and test "models of economic damage," presumably on a class-wide basis. Williams Decl. ¶ 8 (emphasis added). Even then, Dr. Williams advances his estimate of $400,000 to $600,000 in economist fees without any evidentiary support at all. Notably, battles of the experts and scorched-earth litigation are commonplace in antitrust class actions in court. But the focus in an individual arbitration is solely on the individual plaintiff's claims and the "parties forgo the procedural rigor and appellate review of the courts in order to realize the benefits of private dispute resolution," including "lower costs [and] greater efficiency and speed." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 130 S. Ct. 1758, 1775 (2010). The informality of the process gives arbitrators the flexibility to free parties from the procedural and evidentiary burdens that characterize judicial dispute resolution, thereby ensuring that the cost of resolving the dispute does not exceed the amount at stake. Sussman Decl. ¶¶ 17-20, 39-41, 47-48, 55-59, 84-89.

    **3.**    As plaintiffs acknowledge, Opp. 26 n.37, the Supreme Court has granted *certiorari* in *Amex III*. The Supreme Court's decision in that case—which is expected by June 2013—is likely to address whether and in what circumstances a plaintiff may rely on the arbitration-specific or other costs of litigation to avoid an agreement to arbitrate. Defendants respectfully submit that this Court should accordingly await the Supreme Court's decision before deciding any of the issues raised by the Plaintiffs' attempts to invoke *Green Tree* and *Amex III*.

## II.   CONCLUSION

For the reasons set forth in their opening brief and above, Carrier Defendants respectfully request that the Court grant their Motion, compel Plaintiffs to arbitrate all claims on an individual basis, and stay this suit pending arbitration.

| | |
|---|---|
| Dated: New York, New York<br>January 24, 2013 | Respectfully submitted, |

| | |
|---|---|
| CELLCO PARTNERSHIP, D/B/A VERIZON WIRELESS | T-MOBILE USA, INC. |
| | |
| /s/ Luke A. Connelly | Christopher B. Hockett (admitted pro hac vice) |
| Luke A. Connelly | Micah G. Block (admitted pro hac vice) |
| WINSTON & STRAWN LLP | DAVIS POLK & WARDWELL |
| MetLife Building | 1600 El Camino Real |
| 200 Park Avenue | Menlo Park, CA 94025 |
| New York, New York 10166 | Telephone: (650) 752-2009 |
| Telephone: (212) 294-6882 | Email: chris.hockett@davispolk.com |
| Email: lconnelly@winston.com | micah.block@davispolk.com |
| | |
| Thomas J. Frederick | Joel M. Cohen |
| WINSTON & STRAWN LLP | DAVIS POLK & WARDWELL |
| 35 West Wacker Drive | 450 Lexington Avenue |
| Chicago, Illinois 60601 | New York, NY 10017 |
| Telephone: (312) 558-5983 | Telephone: (212) 450-4592 |
| Email: tfrederick@winston.com | Email: joel.cohen@davispolk.com |
| | |
| Andrew G. McBride (AM1966) | SPRINT NEXTEL CORPORATION |
| Thomas R. McCarthy | |
| Christiane M. McKnight | John E. Schmidtlein (admitted pro hac vice) |
| WILEY REIN LLP | Michael V. Pinkel (admitted pro hac vice) |
| 1776 K Street, NW | Megan A. Hughes |
| Washington, DC 20006 | WILLIAMS & CONNOLLY LLP |
| Telephone: (202) 719-7000 | 725 Twelfth Street, N.W. |
| Email: amcbride@wileyrein.com | Washington, D.C. 20005 |
| tmccarthy@wileyrein.com | Telephone: (202) 434-5000 |
| cmcknight@wileyrein.com | Email: jschmidtlein@wc.com |
| | mpinkel@wc.com |
| | mhughes@wc.com |
| | |
| Of Counsel: | |
| Aaron M. Panner | |
| Brendan J. Crimmins | |
| KELLOGG, HUBER, HANSEN, | |
| TODD, EVANS & FIGEL, P.L.L.C. | |
| 1615 M Street, N.W., Suite 400 | |
| Washington, D.C. 20036 | |
| Telephone: (202) 326-7900 | |
| Email: apanner@khhte.com | |
| bcrimmins@khhte.com | |

AT&T MOBILITY LLC

Steven M. Bierman
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599
E-mail: sbierman@sidley.com

John W. Treece
Linton J. Childs
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036
E-mail: jtreece@sidley.com
        lchilds@sidley.com


U.S. CELLULAR CORPORATION

Lawrence Kill
Carrie Maylor DiCanio
ANDERSON KILL & OLICK P.C.
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 278-1000
Email: lkill@andersonkill.com
       cdicanio@andersonkill.com